In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1125

ERIC OLLISON,

*Plaintiff-Appellant,*

*v.*

GREGORY GOSSETT, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:17-cv-01077 — **James E. Shadid**, *Judge.*

ARGUED NOVEMBER 8, 2024 — DECIDED MAY 7, 2025

Before RIPPLE, HAMILTON, and KIRSCH, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Eric Ollison, a former inmate at the Illinois River Correctional Center ("IRCC"), brought this action under 42 U.S.C. § 1983 against several prison officials, including Wardens Walter Nicholson and Gregory Gossett.[1] He alleged that the IRCC's failure to treat his chronic kidney

---

[1] As this case comes to us on appeal, only Nicholson and Gossett remain defendants.

disease, which progressed to acute renal failure, constituted deliberate indifference in violation of the Eighth and Fourteenth Amendments.[2] The district court granted Warden Nicholson's motion to dismiss and Warden Gossett's motion for summary judgment.[3] Mr. Ollison now appeals, contending that the district court erred in granting the motions. He also submits that the district court erred in excluding his expert witnesses. For the reasons set forth in this opinion, we affirm the judgment of the district court.[4]

# I

## BACKGROUND

### A.

Mr. Ollison came to the IRCC on January 17, 2012, where Warden Nicholson and Warden Gossett were wardens for successive periods.[5] The IRCC Warden's responsibilities

---

[2] The Eighth Amendment is applicable to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666 (1962).

[3] The district court's jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1343.

[4] Our jurisdiction is secure under 28 U.S.C. § 1291.

[5] Precisely when each defendant held the role is disputed, and the extent of each warden's potential liability depends in part on his dates of employment. At his first deposition, Warden Gossett testified that he became the IRCC's warden in July 2012. However, in his supplemental answers to interrogatories, Warden Gossett asserted that he became warden in September 2013. Contrary to Mr. Ollison's assertion, the district court did not find that Warden Gossett became warden in September 2013. Instead, it "specifically allowed Plaintiff 'to argue at summary judgment or at trial that Defendant Gossett worked at Illinois River Correctional Center prior to March of 2013.'" R.549 at 5. Despite this invitation, however, Mr. Ollison ( … continued)

include "administering and directing the overall operations, programs, and activities of the [IRCC]" and "developing and implementing policies and procedures."[6] As part of his duties, Warden Gossett had monthly staff meetings with the heads of prison departments, including Nursing Director Edna Greenhagen. He also met regularly with Wexford Health Sources, Inc. ("Wexford") Regional Manager Stacy Moore to discuss the prison's health care unit.[7] Neither Warden Nicholson nor Warden Gossett had medical training. Both concede that Mr. Ollison received inadequate treatment while at the IRCC.

Before Mr. Ollison entered the Illinois Department of Corrections system, he was diagnosed with and treated for kidney disease. When he came to the IRCC, Mr. Ollison informed intake personnel that he had a kidney condition, and his intake laboratory tests confirmed it, but his kidney disease was not noted in his chart. At this time, his condition was under control. His kidney disease then went untreated during his time at the IRCC and progressed. The prison's medical director, Dr. Carla Greby, received lab results in April 2013 indicating that his kidney disease had worsened, but Dr. Greby did not inform Mr. Ollison of the deterioration in his medical condition. Although Dr. Greby did contact a nephrologist, she did not order further testing or treatment.

During the period in question, there were other problems with Dr. Greby and the IRCC's health care unit that are

---

did not present evidence rebutting Warden Gossett's claim that he became warden in September 2013.

[6] R.495-28 at 2 (cleaned up).

[7] Wexford provides health care at the IRCC on a contractual basis.

relevant to the present case. There had been several incident reports that led Wexford supervisory personnel to report that Dr. Greby "need[ed] to understand that if this continues, the Warden will lock her out,"[8] and, in the spring of 2013, Wexford considered terminating Dr. Greby's employment after issuing multiple disciplinary warnings for her treatment of inmates. Health Care Unit Administrator Jonathan Sisson—who was Dr. Greby's supervisor and whose position was left vacant while he was on military leave—described Dr. Greby as thinking it was "her duty to discipline through medicine."[9] Wexford was "holding [its] breath that nothing else significant were to occur as not to leave the site with no Medical Director."[10] Nursing Director Greenhagen testified that it was fair to say "the Administration at Illinois River was well aware" of the "complaints made against Dr. Greby," which she had raised with an assistant warden.[11]

Mr. Ollison's health began to deteriorate noticeably in late 2013. However, as indicated in the grievance that he submitted on December 22, 2013, he attributed the decline to a recent change in medication. He reported that he was "lightheaded, sleeping all day," and was struggling to keep food down.[12] A nonparty provider changed his medication at an appointment on December 26, 2013, and scheduled a follow-up appointment. That same day, Mr. Ollison submitted an emergency

---

[8] R.493-6 at 14.

[9] R.493-4 at 79–80.

[10] R.493-3 at 61.

[11] R.495-23 at 63–66.

[12] R.382-7 at 1–2.

grievance, describing his "lightheadedness, vomiting, swelling of the face[,] and shivering" ever since the change in his medication.[13] He also complained of chest pains and relayed that others had "notic[ed] how [his] performance in the recreation area has been decreasing since the taking of this pill."[14] Warden Gossett reviewed Mr. Ollison's grievance on January 3, 2014, and determined that the situation did not constitute an emergency.[15] He did not believe Mr. Ollison was very sick. In his words, "If you're this ill as you state why are you going to the rec area."[16] Mr. Ollison wrote a third grievance on January 8, 2014, again describing his symptoms.[17] On January 16, 2014, he was hospitalized and diagnosed with acute renal failure.

## B.

Mr. Ollison brought this § 1983 action against, among other defendants, Wardens Nicholson and Gossett. His complaint alleged they were deliberately indifferent to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights. Warden Nicholson moved to dismiss the case against him, asserting that it was untimely, and that Mr. Ollison had failed to state a claim. The district court

---

[13] *Id.* at 4.

[14] *Id.* at 5.

[15] Warden Gossett did not consult with medical staff before making this determination.

[16] R.382-4 at 144.

[17] The prison's only physician was absent from the prison for many of the days between January 1, 2014, and January 16, 2014, during which time Mr. Ollison was critically ill.

granted Warden Nicholson's motion, concluding first that Mr. Ollison's claim was time-barred.[18] "For the sake of completeness," the court also determined that Mr. Ollison failed to state a claim by not alleging facts that imputed personal liability to Warden Nicholson.[19]

After discovery, Warden Gossett moved for summary judgment. In his response to that motion, Mr. Ollison relied on expert reports from Dr. Manpreet Samra and Ralf J. Salke. Warden Gossett then moved to exclude Dr. Samra's and Mr. Salke's reports and testimony. He contended that both lacked relevant expertise. The district court granted the motion. Although recognizing that Dr. Samra and Mr. Salke had extensive expertise in their fields, the court concluded that their testimony would not assist and might confuse the jury. As ordered by the court, Mr. Ollison then filed a revised response to Warden Gossett's summary judgment motion.

The district court granted summary judgment for Warden Gossett. The court first addressed Mr. Ollison's grievances. It concluded that Warden Gossett was not deliberately indifferent to Mr. Ollison's serious medical needs in determining that his second grievance did not constitute an emergency. Turning to Mr. Ollison's assertion that Warden Gossett was liable as a supervisor, the court concluded that Mr. Ollison's submission was attempting to "present new factual allegations" at summary judgment.[20] But even considering his new factual

---

[18] Mr. Ollison later moved to reinstate Warden Nicholson as a defendant when Warden Gossett altered his testimony regarding his dates of employment, but the district court denied the motion.

[19] R.133 at 14–16.

[20] R.549 at 26.

contentions, Mr. Ollison's speculations on what Warden Gossett may have known about deficiencies in the IRCC's health care system were, in the court's view, inadequate.

Mr. Ollison timely appealed.

## II

## DISCUSSION

In this court, Mr. Ollison challenges both the district court's dismissal of his claim against Warden Nicholson and the court's grant of summary judgment to Warden Gossett. He maintains that both defendants were deliberately indifferent in violation of the Eighth and Fourteenth Amendments and that his experts were improperly excluded.

## A.

A prison official violates the Eighth Amendment when he is deliberately indifferent to an inmate's serious medical condition. *See Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Our case law identifies "two distinct categories of deliberate indifference claims" regarding medical treatment. *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430 (7th Cir. 1989).[21] First, there are "claims of isolated instances of indifference to a particular inmate's medical needs." *Id.* Second, there are "claims that systemic deficiencies at the prison's health care facility rendered the medical treatment constitutionally inadequate for all inmates." *Id.* at 430–31. Even though they are separate categories, "[t]he subjective state-of-mind element applies to claims of isolated incidents of indifference *and* pervasive

---

[21] *See also Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 554 (7th Cir. 2016).

deficiencies in prison medical treatment." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (emphasis in original). Mr. Ollison relies on both categories.

The first category has as its touchstone the *personal* responsibility of the defendant supervisor because the doctrine of respondeat superior does not apply to § 1983 actions. *See Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017).[22] Therefore, the supervisory official must have known of, facilitated, approved, condoned, or turned a blind eye to his subordinates' activity, although he need not have directly participated. *See id.* (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)). Most of our cases deal with situations where a plaintiff, already enduring an unconstitutional condition at the hands of subordinates, brings that situation to the attention of a cognizant supervisor and that supervisor turns a blind eye to the problem, well knowing that the plaintiff consequently might suffer an injury. In *Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015), for example, an inmate with a serious hand injury did not receive necessary medical treatment for ten months.

---

[22] *See also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("[A]n official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent." (cleaned up) (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985))); *Childress v. Walker*, 787 F.3d 433, 439–40 (7th Cir. 2015) (recognizing "that an individual must be personally responsible for a constitutional deprivation in order to be liable," but noting that "personal responsibility is not limited to those who participate in the offending act"); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (noting that although the doctrine of respondeat superior does not apply, "a supervisor may be liable for 'deliberate, reckless indifference' to the misconduct of subordinates" (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001))).

*See id.* at 776. He submitted a series of grievances that were either rejected or ignored, then wrote directly to the warden and again received no response. *See id.* at 775–76. We held that the inmate's deliberate indifference claim against the warden should be allowed to proceed because the complaint sufficiently alleged that, based on his correspondence, the warden had actual knowledge of his medical condition but "failed to exercise his … authority to intervene on Perez's behalf to rectify the situation." *Id.* at 782.[23]

Mr. Ollison also premises his allegation on the defendant wardens' failure to address known systemic failures in the health care unit that caused his serious medical condition to go untreated. Senior prison officials may be liable for systemic constitutional violations. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996). However, "[t]he general responsibility of a warden for supervising the operation of a prison is not sufficient to establish personal liability" for systemic deficiencies. *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (alteration in original) (quoting *Est. of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)). To prevail on a systemic deficiency claim, the plaintiff must demonstrate that "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d

---

[23] *See also Pyles v. Fahim*, 771 F.3d 403, 410 (7th Cir. 2014) (determining that an inmate had a "plausible claim" that the warden turned a blind eye to hazardous stairs about which the inmate had complained in an emergency grievance and on which the inmate subsequently fell and was injured).

559, 575 (10th Cir. 1980)).[24] And he must prove that the war-
dens knew of and disregarded a substantial risk of harm to
him. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) ("[A]
prison official cannot be found liable under the Eighth
Amendment … unless the official knows of and disregards an
excessive risk to inmate health or safety.…").[25]

**B.**

Mr. Ollison submits that the district court erred in dismiss-
ing his supervisory liability claim against Warden Nicholson.
This claim falls into the second category we have described
above. We review de novo a district court's dismissal for fail-
ure to state a claim.[26] *See Peterson v. Wexford Health Sources,*

---

[24] Other circuits also have recognized that systemic deficiencies can give
rise to deliberate indifference claims. *See Todaro v. Ward*, 565 F.2d 48, 52
(2d Cir. 1977) ("[T]he Constitution does not stand in the way of a broader
attack on the adequacy of an institute's entire health care system which
threatens the well-being of many individuals."); *Inmates of Allegheny Cnty.
Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (acknowledging that "[s]ys-
temic deficiencies" in inmates' healthcare can constitute deliberate indif-
ference); *Newman v. State of Alabama*, 503 F.2d 1320, 1331–32 (5th Cir. 1974)
(evaluating "systemic medical deficiencies" and concluding that the
prison system's health care facilities were constitutionally inadequate);
*Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (noting that, at least in
the class action context, deliberate indifference may be shown by proving
there are "systemic deficiencies" in medical care).

[25] *See also Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (requiring
knowledge of systemic deficiencies to support an Eighth Amendment
claim); *Steidl v. Gramley*, 151 F.3d 739, 741 (7th Cir. 1998) (concluding that
an inmate's complaint failed to state a claim because it did not allege a
"systematic lapse … that was known to the warden").

[26] We respectfully note that the district court's conclusion that Mr. Olli-
son's claim against Warden Nicholson was time-barred was erroneous. "A
( … continued)

*Inc.*, 986 F.3d 746, 751 (7th Cir. 2021). Although the plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), his complaint must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (quoting *Twombly*, 550 U.S. at 555). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In *Benson v. Cady*, 761 F.2d 335 (7th Cir. 1985), *abrogated on other grounds by Henderson v. Wilcoxen*, 802 F.3d 930 (7th Cir. 2015), Benson alleged that the warden had "failed to implement an adequate system for the speedy diagnosis and treatment of injuries." *Id.* at 341. Because he made only a "conclusory allegation" and "alleged no specific deficiencies in the

§ 1983 claim to redress a medical injury arising from deliberate indifference to a prisoner's serious medical needs accrues when the plaintiff knows of his physical injury and its cause." *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2013). Mr. Ollison did not know of his physical injury, acute renal failure, and its cause, prison officials' failure to monitor his chronic kidney disease, until he was hospitalized. *See id.* at 766–67, 769 (determining that the claim of an inmate who informed medical staff he was at elevated risk of prostate cancer but who did not receive a biopsy for five years accrued no earlier than the date he received his cancer diagnosis). Thus, his injury accrued on January 16, 2014, within the two-year statute of limitations. However, "[w]e may affirm a district court's dismissal on any ground contained in the record," *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017), provided that the appellee raised the argument in the district court. *See Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010). In his memorandum in support of his motion to dismiss, Warden Nicholson submitted that Mr. Ollison's complaint failed to state a claim. Therefore, we will review the court's dismissal for failure to state a claim.

health care system," we concluded that the plaintiff had failed to state a claim of systemic deliberate indifference. *Id.* Mr. Ollison's complaint contains similar conclusory allegations. He alleges that, as a supervisor, Warden Nicholson was "aware of, facilitated, and/or turned a blind eye to the deficient practices which ultimately resulted in injury to Mr. OLLISON." R.1 ¶ 103. But he alleges no specific deficiencies in the IRCC's health care system from which deliberate indifference on the part of Warden Nicholson can be inferred. Elsewhere in the complaint, Mr. Ollison alleges that Warden Nicholson was responsible for the IRCC's overall operation. As we noted earlier, such a general factual allegation is insufficient. Indeed, in *Steidl v. Gramley*, 151 F.3d 739 (7th Cir. 1998), where the plaintiff alleged that the warden was "*ultimately* in charge of, and responsible for, all day-to-day operations," we held that such a general allegation failed to state a claim of systemic deficiencies. *Id.* at 741–42 (emphasis in original). Because Mr. Ollison's complaint only contains general allegations and does not put Warden Nicholson on notice of the factual grounds on which his systemic deficiency claim rests, the district court correctly concluded that Mr. Ollison failed to state a claim against Warden Nicholson.

## C.

Mr. Ollison also contends that the district court erred in granting Warden Gossett summary judgment. We review de novo the district court's decision. *See Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 634 (7th Cir. 2024).

Mr. Ollison first submits that, by declaring his second grievance nonemergent, Warden Gossett was deliberately indifferent to his serious medical condition. This claim falls within the first category of deliberate indifference claims that

we described earlier.[27] To prevail on a claim of deliberate indifference, Mr. Ollison must prove (1) that he had an objectively serious medical condition[28] (2) to which Warden Gossett was deliberately indifferent. *See Petties*, 836 F.3d at 728. To satisfy the second requirement, Mr. Ollison "must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Id.* (emphasis in original). Warden Gossett reviewed the only grievance he received from Mr. Ollison[29] and determined that it did not present an emergency. In that grievance, Mr. Ollison stated that a medication change caused him lightheadedness, vomiting, chest pains, and other complications. But because his grievance also suggested that he was still going to the recreation area, Warden Gossett concluded that Mr. Ollison was not seriously ill. The information in the grievance provided did not give Warden Gossett "sufficient notice to alert him … to 'an excessive risk to inmate health or safety.'" *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996) (quoting *Farmer*, 511 U.S. at 837). Therefore, Warden Gossett did not know of and disregard a substantial risk of harm to Mr. Ollison by concluding that the grievance was nonemergent.

Mr. Ollison's second contention focuses on systemic deficiencies in the prison's health care unit and presents a more

---

[27] *See supra* Part II.A.

[28] The parties do not dispute that Mr. Ollison's acute renal failure was an objectively serious medical condition.

[29] Mr. Ollison provides no evidence that his first and third grievances reached Warden Gossett. Without receiving the grievances, Warden Gossett could not know of and disregard a substantial risk of harm based on them. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc).

complex situation. As our colleague in the district court recognized, Mr. Ollison's argument initially confronts a procedural issue. With respect to the systemic deficiencies claim against Warden Gossett, the allegations set forth in the complaint are practically identical to those made against Warden Nicholson. Therefore, if we confine our inquiry to an evaluation of those allegations, we would have to conclude that the complaint is insufficient to state a cause of action for deliberate indifference against Warden Gossett. As the district court noted, Mr. Ollison's "complaint made no mention of the Health Care Administrator's tenure, Dr. Greby's absenteeism, Wexford's consideration of terminating Dr. Greby's employment, an alleged cover up, or Defendant Gossett's knowledge of any specific deficiencies in the provision of medical care."[30]

Realizing this difficulty, Mr. Ollison renews the argument that he made before the district court. He submits that, if we take into account the facts that he has brought forth for the first time in support of his summary judgment motion, there are sufficient allegations of *and* evidentiary support for his systemic deficiencies claim to withstand the summary judgment motion. The district court declined to consider these "new factual allegations" that Mr. Ollison raised for the first time in his filings opposing summary judgment.[31] To support its decision, the court relied principally on *Whitaker v. Milwaukee County*, 772 F.3d 802 (7th Cir. 2014), *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th Cir. 2017), *Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017), and *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996). The district court viewed

---

[30] R.549 at 25.

[31] *Id.* at 26.

these cases as supporting the proposition that a plaintiff may not amend his complaint in response to a summary judgment motion by proffering "an entirely new factual basis to support a claim."[32]

In *Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023), we revisited and clarified how courts ought to deal with a situation where a litigant attempts to introduce into his case, through a "constructive amendment," a claim for which his complaint is factually deficient. *Id.* at 489.[33] *Schmees* emphasized the importance of the complaint to fair, orderly, and efficient litigation. Pleadings focus the litigation and ensure that defendants receive "fair notice of each claim against them, as required by the Federal Rules of Civil Procedure." *Id.* at 488.[34] Consequently, "[m]any efficiencies are lost when claims or defenses are left out of pleadings and a party then attempts to assert them at later stages." *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 479 (7th Cir. 2019). However, because discovery often uncovers facts that support new legal theories, parties may seek leave to amend their pleadings. *See* Fed. R. Civ. P. 15(a)(2). Nevertheless, as in this case, parties sometimes forgo

---

[32] R.549 at 24.

[33] The district court's summary judgment order, issued on December 20, 2022, predated *Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023), which abrogated in part *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996) and *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529 (7th Cir. 2018).

[34] *See also Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 479 (7th Cir. 2019) ("Pleadings shape the litigation, including the scope and cost of discovery.").

formal invocation of Rule 15 and instead simply make new factual assertions at summary judgment.

Before *Schmees*, there was some ambiguity in our case law as to whether district courts had discretion to allow plaintiffs to amend their complaints through summary judgment briefing. For example, in *Shanahan*, we determined that "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." 82 F.3d at 781. We repeated this prohibition in *BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 900 F.3d 529 (7th Cir. 2018), writing that "although a plaintiff generally can alter the legal theories asserted in its complaint, it cannot alter 'the factual basis of [its] complaint at summary judgment.'" *Id.* at 541 (alteration in original) (quoting *Whitaker*, 772 F.3d at 808). However, in *Chessie Logistics*, decided the year prior, we had reached a different conclusion. We explained that when a plaintiff's briefing alters his factual theory, he constructively amends his complaint, "and the district court has discretion to deny the *de facto* amendment and to refuse to consider the new factual claims." 867 F.3d at 860.

In *Schmees*, we noticed this set and drift in our case law and undertook to set a steadier course. We held that "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." *Schmees*, 77 F.4th at 488. We made clear, however, that simply because the district court may consider new factual allegations does not mean it is required to do so. On the contrary, "[i]t will rarely be appropriate to do so." *Id.* at 490. *Schmees* itself illustrates this cautious approach. There the district court invited the plaintiff to refile a motion seeking leave to amend her complaint to add new factual support. *See*

*id.* at 487. She declined to do so, choosing instead to raise those facts for the first time in her brief opposing summary judgment. *See id.* On appeal, we determined that the district court did not abuse its discretion by declining to treat the new factual allegations raised in summary judgment briefing as a constructive motion to amend. *See id.* at 490. Because the plaintiff "rejected the opportunity to properly add the factual underpinnings for the new claim, justice did not require that [she] be allowed to smuggle it into the case through her summary judgment briefing." *Id.*

In the present case, the district court's opinion was not, understandably, focused on whether it had the discretion to consider the additional facts tendered by Mr. Ollison. Some passages of the opinion, especially when examined in isolation, suggest that the district court thought our case law established an absolute prohibition against considering the additional facts presented in the summary judgment record. However, our study of the district court's treatment of the issue in its totality convinces us that the district court believed that, even if it had such discretion, Mr. Ollison did not deserve a favorable exercise of that discretion. Perhaps the clearest evidence of the district court's view was its observation that, even though Mr. Ollison had a clear warning that his complaint was insufficient after the earlier dismissal of the complaint against Warden Nicholson, he made no attempt to amend his almost identical complaint against Warden Gossett. In light of *Schmees*, the district court's observations certainly entitled it to conclude that Mr. Ollison should have given the court and the defendant more adequate notice of his intent to make a claim of systemic deficiencies based on facts not alleged in the complaint.

Mr. Ollison arguably could not have known, until discovery was complete, that the deficiencies in the health care unit were broader than just the insufficient care he received. However, Mr. Ollison does not put forth a persuasive explanation for his decision not to amend his complaint. Mr. Ollison filed his complaint on January 15, 2016. The district judge dismissed his case against Warden Nicholson on November 29, 2016, putting Mr. Ollison on notice that his complaint was factually deficient. Discovery proceeded, albeit haltingly, for more than four years. Warden Gossett subsequently filed the motion for summary judgment at issue on September 1, 2021. Because Mr. Ollison had ample time to digest the facts he was uncovering and amend his complaint to bolster his claim of systemic deficiencies, we see no reason to permit him to constructively do so by way of summary judgment briefing.

We also are not persuaded by Mr. Ollison's contention that Warden Gossett had adequate notice of his systemic claim because it "was repeatedly mentioned at court appearances, in documents, and at deposition."[35] In *Schmees*, we rejected the plaintiff's contention that the defendant had notice of her new facts because she referred to them in a few filings and a settlement conference. *Id.*; *see also Colbert*, 851 F.3d at 656–57 (determining that defendant did not have fair notice of new issue even though plaintiff raised facts relevant to it at deposition). Accordingly, even though facts upon which Mr. Ollison's systemic deficiencies claim are predicated were mentioned in discovery requests, depositions, and expert reports, Warden Gossett did not have fair notice of the claim.

---

[35] Appellant's Br. 54.

Even assuming for the sake of argument that Mr. Ollison could clear the significant procedural barrier of his infirm complaint, the factual allegations he would have us consider are insufficient to withstand summary judgment. Our case law certainly establishes that a public officer, or a private person acting in the name of the state, can be held responsible for allowing systemic deficiencies to fester, if the deficiencies, left unchanged, will foreseeably result in injury to the plaintiff. *See, e.g.*, *Wellman*, 715 F.2d at 272–74, 277 (concluding that the prison's leaving its staff psychiatrist position vacant for two years, having difficulty stocking necessary medical supplies, and employing two physicians who could not communicate effectively with patients due to a language barrier amounted to systemic deficiencies "for which senior prison officials may have been responsible").[36]

After careful review of the record, however, we agree with the district court that Mr. Ollison has not presented a record that can withstand a summary judgment motion on his claim of systemic deficiencies. We have examined with particular scrutiny the possibility that Mr. Ollison might have alleged adequately that Warden Gossett knew of the sorry state of affairs in the health care unit and nevertheless permitted systemic deficiencies to persist. To sustain such a claim, Mr. Ollison would have to establish that Warden Gossett knew of the health care unit's defects and consciously disregarded them, understanding that his disregard exposed to significant

---

[36] *See also Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 428–32 (7th Cir. 1989) (holding that the plaintiff stated a claim of systemic deliberate indifference against the official who failed to ensure that his proposed changes to medical procedures were implemented after the death of an inmate who had been prescribed medicine over the phone).

jeopardy the health of chronically ill patients such as Mr. Ollison.[37]

Whether assessed from a quantitative or a qualitative perspective, the record leaves much to be desired as to Warden Gossett's knowledge about the conditions in the health care unit, especially with respect to the continued employment of Dr. Greby. Assuming, for the sake of argument, that Warden Gossett did have an adequate understanding of the situation in the heath care unit, Mr. Ollison still has not presented sufficient evidence to establish that he was deliberately indifferent in his response to that information. It is clear that Warden Gossett did not have adequate authority to hire another physician to replace Dr. Greby. Procuring adequate professional personnel for the medical unit was the responsibility of Wexford.[38] Until Wexford made available another physician for the IRCC, Warden Gossett was left with the difficult choice of operating with no physician or tolerating the continued presence of Dr. Greby. This record simply will not sustain a jury finding that the difficult decision to allow her presence until another physician was available was a deliberately indifferent one. At the very best, we can speculate that Warden Gossett could have been more proactive in insisting that Wexford find a replacement physician. Similarly, one can wonder whether Warden Gossett should have sought a temporary Health Care Unit Administrator while the permanent administrator was

---

[37] *See Vance v. Peters*, 97 F.3d 987, 994 (7th Cir. 1996) (holding that the warden was not "sufficiently alerted of a lapse in [an inmate's] treatment as to require her intervention or further investigation").

[38] This process involved recruiting qualified candidates for the Illinois prison system and then allocating the available personnel among the various facilities within Wexford's area of contractual responsibility.

on military leave. Whether either of these courses were possible and, if possible, whether they would have been fruitful, is, on this record, speculative and certainly not supportive of a determination of deliberate indifference.

In reaching our conclusion that the record would not support a finding of liability on the part of Warden Gossett for permitting the systemic deterioration of the facility to go unchecked, we have taken into consideration, and scrutinized, the district court's decision to exclude the proffered testimony of Mr. Ollison's experts. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires that the district court act as gatekeeper to ensure that expert testimony is relevant and reliable. *See id.* at 589; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Our review of the district court's exclusion of proffered expert testimony requires that we engage in a two-part inquiry. We first review de novo whether the district court followed Rule 702 and *Daubert*. *See Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 782 (7th Cir. 2017). "If the court correctly 'applied the Rule 702/*Daubert* framework, we review [its] decision to admit or exclude expert testimony for abuse of discretion.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872 (7th Cir. 2021) (alteration in original) (quoting *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017)). Under that standard, "we will not disturb the district court's findings unless they are manifestly erroneous." *United States v. Adame*, 827 F.3d 637, 645 (7th Cir. 2016) (quoting *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012)).

The district court correctly followed the methodology required by *Daubert*. It outlined accurately the legal standard, providing an overview of Rule 702 and *Daubert*. The district court then conducted a thorough review of the experts'

materials.[39] It examined Dr. Samra's and Mr. Salke's extensive experience in their respective fields. It then considered the reliability of their testimony. Only then did the court conclude that neither expert's opinions would assist the jury.

Because the district court properly applied the correct legal standard, we review its exclusion of expert testimony for an abuse of discretion.[40] In her proffered testimony, Dr. Samra took the view that Warden Gossett should have known from Mr. Ollison's grievances that his kidney disease had progressed and should have transferred him to another prison or referred him to a nephrologist. The district court appropriately noted that although Dr. Samra would be qualified to give her opinion on the care medical professionals provided, she was not qualified to opine on the care Warden Gossett, a nonmedical official, provided.[41] Dr. Samra also maintained that because the warden was not competent to evaluate the medical records himself, Warden Gossett should have had

---

[39] *Compare Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 783 (7th Cir. 2017) (approving the district court's thorough discussion and application of the test), *with Naeem v. McKesson Drug Co.*, 444 F.3d 593, 608 (7th Cir. 2006) (rejecting the district court's one-sentence analysis).

[40] An abuse of discretion "can occur when a court commits a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor, when a court treats a single *Daubert* factor as dispositive, or when the record contains no evidence upon which the trial judge rationally could have based his decision." *Gopalratnam*, 877 F.3d at 782 (internal quotation marks and citations omitted).

[41] *See Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) ("The question we must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" (alteration in original) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994))).

Mr. Ollison's charts reviewed before addressing his grievance. Dr. Samra did not review prison grievance policies in advance of her testimony. The court concluded that she lacked the expertise necessary to give this opinion. Finally, she opined that Warden Gossett should have had another physician come to the prison in Dr. Greby's absence. In addition to noting her lack of expertise in prison administration,[42] the court determined that her testimony would not assist the jury. Because the court's decision was rationally based on the evidence before it, the district court did not abuse its discretion by excluding Dr. Samra's opinions.

Nor was the district court's decision to exclude Mr. Salke's testimony manifestly erroneous. *See Adame*, 827 F.3d at 645. Mr. Salke stated that Warden Gossett was underqualified. In his view, the warden should have filled the Health Care Unit Administrator vacancy during Mr. Sisson's military leave. He also asserted that the warden knew of problems with Dr. Greby and further opined that Warden Gossett was liable as a supervisor. The court correctly determined that Mr. Salke's opinion on Warden Gossett's qualifications, which he based on common sense, was not an expert opinion.[43] The court appropriately concluded that expert testimony was not required to assist the jury in deciding whether Warden Gossett knew of the problems with Dr. Greby. Finally, Mr. Salke's opinion regarding supervisory liability

---

[42] *See United States v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1998) (noting that opinions must be "informed by the witness' expertise" to be expert opinions (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991))).

[43] *See id.*

inappropriately stated a legal conclusion and the district court properly excluded it.[44]

It was not an abuse of discretion for the district court to exclude the testimony of Dr. Samra and Mr. Salke.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED

---

[44] *See Good Shepherd Manor Found., Inc., v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003).

KIRSCH, *Circuit Judge*, concurring. I join the majority opinion. Regardless of the merits of Eric Ollison's claims, the district court did not err in dismissing his claim against Warden Walter Nicholson or in refusing to consider the new argument he made in opposing Warden Gregory Gossett's motion for summary judgment. I write separately to address two points made in the dissent.

First, our dissenting colleague says we should reverse the dismissal of Ollison's claim against Warden Nicholson because the district court did not consider new evidence when it denied Ollison's motion to reconsider. *Post* at 55–56. In its view, Ollison did not need to move to amend his complaint because doing so would have been futile in light of the district court's erroneous statute of limitations ruling, and because he had already put this evidence before the district court in his motion to reconsider. *Id.* That is an interesting argument, but it is not one Ollison advances on appeal. Ollison's argument is that the allegations in his complaint are sufficient to state a claim against Warden Nicholson. The majority opinion ably explains why that is not the case. *Ante* at 10–12. Although Ollison is correct that, on appeal, he can elaborate on the complaint's factual allegations, to do so there must be sufficient factual material in the complaint to elaborate on. *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1147 (7th Cir. 2010). There isn't any. Conclusory statements are not factual allegations.

Second, the dissent says the majority opinion overlooks the difference between a claim and a legal theory of relief. *Post* at 53–54, 57–61. In its view, Ollison raises a single claim against Warden Gossett based on two legal theories of relief. *Id.* at 57–58. I fail to see why the claim/theory distinction is relevant here. Different theories of relief are often supported

by different factual allegations. Although plaintiffs need not plead specific legal theories, defendants are entitled to fair notice of the factual allegations that support a plaintiff's entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Accordingly, plaintiffs do not have free rein to change the factual basis of their claim at summary judgment. Our explanation in *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th Cir. 2017), is instructive:

> The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories. Accordingly, when a plaintiff does plead legal theories, it can later alter those theories.…

> This is not the framework that applies when a plaintiff changes its factual theory during summary judgment briefing. Plaintiffs do have to raise factual allegations in their complaints. An attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint.…

> … [T]he district court has discretion to deny the de facto amendment and to refuse to consider the new factual claims.

*Id.* at 859–60 (cleaned up).

Where, like here, the plaintiff raises a new argument at summary judgment, we must determine "whether it changes the complaint's factual theory, or just the legal theories plaintiff has pursued so far." *Id.* at 860. One way to do so is to ask if the plaintiff's new theory of relief is supported by the factual allegations in the complaint. If it isn't, then the plaintiff is changing the factual basis of his claim. See *id.* at 860–61; *BRC*

*Rubber & Plastics, Inc. v. Cont'l Carbon Co.*, 900 F.3d 529, 541 (7th Cir. 2018); *Whitaker v. Milwaukee County*, 772 F.3d 802, 808–09 (7th Cir. 2014). That is what happened here. Ollison's argument at summary judgment—that Warden Gossett exhibited deliberate indifference to systemic deficiencies at the prison's health care facility—is wholly unsupported by the well-pleaded factual allegations in the complaint, which focus narrowly on Gossett's response to Ollison's grievances. *Ante* at 14; see also *id.* at 7–10 (explaining the different factual bases that support each theory of relief). The dissent suggests otherwise, *post* at 58, but I fail to see what factual allegations it is alluding to. The bald assertion that Warden Gossett was "aware of, facilitated, and/or turned a blind eye to the deficient practices" that led to Ollison's injuries is not a well-pleaded factual allegation.

Because Ollison changed the factual basis of his claim at summary judgment, the district court had the discretion to deny this de facto amendment. *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488–90 (7th Cir. 2023). That discretion empowers district courts to ensure a just, speedy, and inexpensive resolution for the parties. Fed. R. Civ. P. 1. As the facts of this case illustrate, determining when the equities weigh in favor of permitting a plaintiff to constructively amend his complaint is a difficult, fact-intensive question. For the reasons stated in the majority opinion, the district court did not abuse its discretion here. *Ante* at 15–18.

HAMILTON, *Circuit Judge*, dissenting.

I. *Introduction*

Plaintiff Eric Ollison was a victim of an appalling failure to provide needed medical care at an Illinois prison. His chronic kidney disease was eminently treatable, but systemic failures in prison health care put him on life support and caused permanent brain damage and physical injuries.

Ollison reached an extraordinary settlement with Wexford and the medical defendants for three million dollars. His claims against the prison wardens, however, have been caught in an unfair whipsaw of erroneous and inconsistent district court decisions. First, the Northern District dismissed the claim against Warden Nicholson based on the statute of limitations. The majority and I agree that was wrong. Ante at 10–11 n.26. Second, Ollison asked the Central District to reconsider that dismissal based on new evidence obtained in discovery. The court refused, repeating the statute of limitations error and refusing to consider the new evidence on the merits. Third, when plaintiff opposed summary judgment for Warden Gossett by offering evidence of his awareness of the systemic failures in the prison's medical care, the Central District failed to recognize that it at least had discretion to consider that information. The majority and I agree that was an error, see ante at 16–17, though I think the district court was obliged to consider that information.

The majority errs, however, by choosing not to remedy the unfair effects of those errors and by focusing on what it asserts incorrectly were fatal procedural missteps by plaintiff. We should instead reverse the judgment in favor of the two wardens and remand for trial against both. Plaintiff Ollison's

evidence would allow a reasonable jury to find that Warden Nicholson or Warden Gossett or both knew of the long-term systemic breakdown in medical care at the prison and responded with deliberate indifference. The foreseeable results included the grave injuries to plaintiff Ollison.

Making matters worse, the majority's procedural lifelines for the defendant wardens are ill-advised. They punish the plaintiff for having failed to amend his complaint in response to a merely hypothetical motion to dismiss. They also set and spring a trap on the plaintiff for having missed an imaginary deadline for adding factual detail to the complaint. These procedural lifelines are likely to cause lawyers and district courts to waste time on cleaning up pleadings rather than focusing on the merits of serious disputes.

## II. *Common Ground*

Before explaining why I believe the majority opinion errs, several points of common ground deserve emphasis. First, we agree that plaintiff offered evidence that his medical care was provided (or denied) by a doctor who was deliberately using poor and abusive medical care to punish prisoners. A jury could find that the doctor's work epitomized what the Eighth Amendment prohibits: cruel and unusual punishment.

Second, we agree that prison officials can violate the Eighth Amendment by responding with deliberate indifference to serious and systemic deficiencies in prison health care. See ante at 9–10 & nn.24 & 25; *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996); *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–32 (7th Cir. 1989); *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (deliberate indifference can be shown by "such systemic and gross deficiencies in staffing, facilities,

equipment, or procedures that the inmate population is effectively denied access to adequate medical care" (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

I believe we also agree that such a theory requires proof that the individual defendant (a) had actual knowledge of the deficiencies and (b) failed to take reasonable remedial steps that were within that defendant's power. See *Farmer v. Brennan*, 511 U.S. 825, 844 (1994) ("prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk"); *Ortiz v. Jordan*, 562 U.S. 180, 190 (2011) (noting that *Farmer*'s deliberate indifference standard was "not in controversy"); *LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). And we agree that a defendant's reasonable response will defeat a claim of deliberate indifference even if the response was not successful. *Farmer*, 511 U.S. at 844; *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

I also appreciate that the doctor's appalling performance posed a difficult problem for the wardens. They knew for more than a year that Wexford was trying to fire and replace Dr. Carla B. Greby, who is at the center of this case. Medical positions at prisons can be difficult to fill. Warden Gossett saw his choice at least at one point as either tolerating the intolerable Dr. Greby a little longer or going without any onsite physician for more than 2,000 inmates. But whether the wardens' responses to the Dr. Greby dilemma were reasonable, or perhaps started out as reasonable but eventually became unreasonable, should present factual issues for trial. See *Wellman*, 715 F.2d at 273 (finding systemic deliberate indifference in prison medical care; despite prison officials' apparent good intentions, failure to fill critical

psychiatrist position for two years "may weigh more heavily against the state than for it").

I also agree with the majority on two important aspects of the grant of summary judgment for Warden Gossett. Summary judgment was proper regarding his response to plaintiff's grievance on December 26, 2013, which Gossett reviewed on January 3, 2014. He concluded (without consulting medical personnel) that it did not require an emergency response. Plaintiff's grievance complained that his "performance in the recreation area" had been decreasing since his medication had been changed. Gossett responded to the grievance by asking plaintiff why, if he was as sick as he claimed, he was still going to the recreation area. That response was not close to optimal, but a jury could not reasonably find that it amounted to deliberate indifference.

The district court also did not make a reversible error in rejecting testimony from plaintiff's expert witnesses, Dr. Samra and Mr. Salke, in deciding the summary judgment motion. Both clearly have expertise and opinions that are relevant to the case overall. The problem is that their expertise does not address the narrow issues that were decisive on summary judgment in favor of Warden Gossett. See ante at 22–23.[1]

---

[1] If the case were to go to trial, the district court would need to reconsider those witnesses. Dr. Samra's medical opinions would be central to trial issues of causation and damages. Mr. Salke's opinions about prison operations might well be relevant and admissible regarding the reasonableness of both wardens' responses to the steady stream of information they received about Dr. Greby and the threat her awful performance posed to the health of all inmates, and especially those with serious chronic diseases like plaintiff Ollison. See *Jimenez v. City of Chicago*,

Despite these points of agreement, the majority errs in affirming dismissal of Warden Nicholson and summary judgment for Warden Gossett. To explain those errors, Part III sets forth the evidence against both wardens that plaintiff submitted to the district court and explains why that evidence should be sufficient to go to trial against both. Part IV explains why the majority's procedural grounds for affirming are unjustified and ill-advised.

III. *The Merits of Plaintiff's Claims*

A. *Plaintiff's Kidney Disease*

Plaintiff Ollison arrived at the Illinois River Correctional Center in January 2012. He had a history of kidney disease, but it had been well-managed up to that time. Ollison believed incorrectly that it had been cured. In fact, though, blood tests at Illinois River showed elevated creatinine levels, indicating kidney disease that called for careful monitoring. But plaintiff received no medical attention for his kidney disease for more than a year.

In April 2013, Dr. Greby received lab results showing that plaintiff's kidney disease had progressed to a dangerous point, but some aspects of the disease were still reversible with proper care. R. 405-8 at 139–40, 149–51 (Greby Dep.);

---

732 F.3d 710, 721 (7th Cir. 2013) ("In constitutional tort cases, expert testimony regarding sound professional standards governing a defendant's actions can be relevant and helpful."); *Haley v. Gross*, 86 F. 3d 630, 644–45 (7th Cir. 1996) (no abuse of discretion in deliberate indifference case where district court allowed "an expert in the area of corrections and prison management" to "testify regarding what he believed to be the proper response to certain prison situations").

App. B3 at 23.[2] Dr. Greby did not inform plaintiff. She contacted a Wexford nephrologist who told her to send plaintiff to a hospital for a complete work-up. R. 535-7 at 152–54, 162–64 (Einwohner Dep.). Yet Dr. Greby did not follow that advice from a specialist. Nor, apparently, did she take any other measures in response to the ominous lab results. Between April 2013 and early January 2014, plaintiff met with Dr. Greby multiple times, but no follow-up labs were drawn, and Dr. Greby took no other action to monitor or respond to plaintiff's advancing kidney disease.

In November 2013, months after Dr. Greby failed to send him for the recommended work-up, plaintiff suddenly felt extremely ill. R. 405-1 at 5 (Ollison Decl.). Plaintiff's medical expert has explained that kidney disease is a "silent disease" that will often show no symptoms until renal failure is imminent. App. B3 at 21. (Dr. Samra's opinion on this point is well within her expertise.) In the following weeks, plaintiff received little medical attention but continued to receive medications that were contraindicated for someone with kidney disease. He did not understand what was wrong. App. B3 at 14–15. His three grievances about the lack of medical attention received no effective response.

Blood tests done on January 8, 2014, a week before plaintiff's renal failure crisis, showed "alarmingly dangerous levels" of creatinine and uremia (urine proteins), meaning his kidneys were not filtering out waste products. App. B3 at 17. Those levels signaled, according to Dr. Samra, "the onset of

---

[2] Citations to district court docket entries take the form of R. __ and use the electronic PDF pagination, not the pagination internal to the document.

renal failure" and called for immediate medical attention. *Id.* That same day, though, Wexford sent Dr. Greby home for, among other things, refusing to work during a flu outbreak at the prison. R. 493-3 at 74 (Stacy Moore Jan. 8, 2014 email). Her supervisor reported that "it was more beneficial to the unit to not have her there than to have her on site as a negative influence." *Id.* The next day, on Thursday, January 9, Dr. Greby reviewed plaintiff's alarming lab report, but she just handed it off to a clerk without taking any action. Greby Dep. at 152–53, 155–56; R. 535-52 at 126–27 (Stein Dep.).

During the next week, Dr. Greby was absent without cause until after plaintiff went to the emergency room. R. 535-2 at 5–6 (Greby attendance records). In her absence, nobody with a medical degree was working at the prison. See R. 493-4 at 55 (Moore May 31, 2013 email); App. B1 at 8. On January 15 and 16, plaintiff complained of vomiting every day since December, nausea, constipation, and swollen limbs. Stein Dep. at 127, 130. Based on these complaints, and in Dr. Greby's absence, a nurse looked at plaintiff's chart. She discovered the highly abnormal lab results from January 8. *Id.* at 153. After contacting the on-site physician assistant and a remote nephrologist, the nurse took new labs. *Id.* at 135, 154. Plaintiff's already "alarmingly dangerous" creatinine levels had gotten even worse. *Id.* at 136. The nephrologist called Wexford's national medical director to alert him that plaintiff was having a medical emergency and needed emergency hospital care. Einwohner Dep. at 191–95.

On Thursday, January 16, plaintiff was taken to a hospital and was diagnosed with high uremia levels and acute renal failure consistent with end-stage renal disease. His kidneys had likely been failing since December. App. B3 at 29. He was

placed on emergency hemodialysis. The procedure is inherently risky, and plaintiff became paralyzed on his left side and suffered strokes and seizures. Doctors feared that he might not recover from what they described then as a vegetative state. They recommended only palliative care. App. B5.

Plaintiff remained in a coma for nearly three weeks. He then began to recover. In February 2014 he was sent to other hospitals for rehabilitation, but he has suffered long-term physical and mental injuries. R. 406-2 at 2 (Waimei Tai Expert Report); App. A5 at 8. As of late 2020, plaintiff was on a waiting list for a kidney transplant.

B.  *The Systemic Deficiencies*

*Dr. Greby's Abuse of Inmates*: Depositions taken before January 2020 revealed most of these details about the lapses in individual medical care that led to plaintiff's kidney failure. However, plaintiff did not know the scale of the dysfunction in the health care unit until after February 12, 2020, when he received court-ordered production of more than 700 pages of emails and other documents from Wexford. Those emails revealed a longstanding consensus within Wexford that Dr. Greby's approach to her work amounted to a systemic breakdown in the Illinois River health care unit.

The details of Dr. Greby's mistreatment of other prisoners are not essential here. Wexford's settlement with plaintiff for three million dollars speaks volumes. The record includes the avoidable deaths of other prisoner-patients and reports of both physical and verbal abuse of patients that Wexford considered reliable enough to discipline and eventually fire Dr. Greby. Even as early as the spring of 2012, the situation was bad enough that Wexford had given Dr. Greby a "Final

Warning," and the warden was moving toward locking Dr. Greby out from Illinois River. R. 493-3 at 76–77 (March 2012 Final Warning); R. 493-6 at 94 (medical director review); R. 493-6 at 74 (Moore March 1, 2012 email).[3]

A month later, Wexford's director of nursing reported there had been multiple incidents where Dr. Greby had signed off on abnormal lab test results without following up with the patients. R. 493-6 at 64 (Greenhagen April 27, 2012 email). In one case, a patient went without treatment for Hepatitis C for a month until severe abdominal pain led nursing staff to check a lab test that had been taken a month prior. *Id.* During this period, Dr. Greby was also frequently late or absent from work, and she routinely failed to follow the procedures for calling in. R. 493-6 at 32 (Moore June 22, 2012 email), 38 (attendance memo), 39–40 (Moore June 8, 2012 email). That was all a year and a half before plaintiff's medical crisis in January 2014.

The Health Care Unit administrator of the Illinois River facility was on military leave for almost all of 2012 and 2013, meaning that the warden had no assistant keeping close tabs on Dr. Greby and the health care unit. When the administrator returned briefly to Illinois River in April 2013 between military assignments, he reported that prisoner-patient complaints about Dr. Greby were becoming "more frequent and more intense." He asked Wexford to have a different doctor see two patients who said they had been berated and even physically abused by Dr. Greby. R. 493-5 at 28–29 (Sisson April 19, 2013 email). He also reported: "Dr. Greby thinks all

---

[3] The wardens had the authority to unilaterally "lock out" IDOC or Wexford employees – i.e., prevent them from coming back into the facility.

inmates are liars and it is her duty to discipline through medicine." *Id.* at 29. That damning assessment concisely defines cruel and unusual punishment in prison health care.

In May 2013, Wexford regional director Stacy Moore was ready to fire Dr. Greby if she did not resign immediately. At that point, it was "very evident" that Dr. Greby would "never change her ways." R. 493-5 at 9 (Bodnar May 10, 2013 email). A Wexford employee explained the situation internally: "The only reason we have tolerated Dr. Greby at IL River this long is because we had nobody to replace her. She's been given every kind of discipline imaginable and still a big problem and risk. In the latest incidents we had with her, she has resorted to kicking an inmate in his sore leg." R. 493-4 at 61 (Bodnar May 24, 2013 email).

A plan to replace Dr. Greby fell through when a new physician went instead to another Illinois prison. At Illinois River, Wexford was in damage control mode. Wexford knew that Dr. Greby was at best ineffective and absent and at worst an ongoing threat to patients' health and safety. See R. 493-3 at 59–61 (January 13–24, 2014 emails), 70–71 (Moore January 10, 2014 emails), 74 (January 8–9, 2014 emails), 87–88 (Moore December 13, 2013 email). It also knew that further discipline had become an idle threat. R. 493-3 at 61 (Moore January 13, 2014 email). Three days before plaintiff's crisis in January 2014, Wexford's Moore described the situation at Illinois River: "we have basically been holding our breath that nothing else significant were to occur as not to leave the site with no Medical Director." *Id.*

Dr. Greby was finally fired by Wexford on January 31, 2014, two weeks after plaintiff's crisis put him in the hospital on life support and one week after another prisoner-patient

died from rectal cancer that had not been detected. R. 493-3 at 35 (Termination Notice), 59 (Moore January 24, 2014 email). In a reference to plaintiff Ollison, the termination notice identified as evidence of her unsatisfactory performance Dr. Greby's "handling of a recent case involving a patient with renal issues" despite numerous disciplinary actions and warnings. R. 493-3 at 35.

C. *The Wardens' Knowledge and Responses*

The evidence summarized so far shows why Wexford settled with plaintiff, but the claims against the wardens require more. They require evidence that each actually knew of those systemic failures in prison health care and evidence that each failed to respond reasonably. See *Farmer v. Brennan*, 511 U.S. 825, 844, 847 (1994). Plaintiff did not, however, need to show that either warden was specifically aware of *his* chronic kidney disease or the health care unit's failure to treat it. He needed to show only that the wardens had actual knowledge of a systemic breakdown putting all prisoner-patients at risk. See *id.* at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."); *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) ("subjective state-of-mind element applies to claims of … pervasive deficiencies in prison medical treatment"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1428–29 (7th Cir. 1996) (reversing in part dismissal and allowing some claims of systemic breakdowns in jail conditions to proceed against senior officials); *Cleveland-Perdue v. Brutsche*, 881 F.2d 427, 430–32 (7th Cir. 1989) (affirming denial of qualified

immunity for senior officials who failed to correct systemic deficiencies in prison's health care).

Plaintiff's strongest evidence about the wardens' knowledge comes from the Wexford emails and documents and the deposition testimony of Wexford's Stacy Moore. Those emails summarized communications between the warden and Wexford about Dr. Greby's failings.[4]

The discussion below recounts the evidence against the "warden" without distinguishing between Warden Gossett and Warden Nicholson because the Wexford emails almost always referred to the warden simply as "warden." This feature of the Wexford emails would be important at trial— the question is who was warden when—but it does not affect the pretrial viability of plaintiff's claim against either warden.

The Wexford emails reveal that Director Moore was in regular communication with the Illinois River warden about Dr. Greby's incompetent, erratic, abusive, and dangerous performance as medical director. Part of Moore's job was to visit Illinois River each week or so. See R. 495-26 at 56, 88–89 (Moore Dep.). She testified that she was in communication with the warden via email and that it was her practice to speak with him during each site visit if he was available. *Id.* The Wexford emails and Moore's testimony reflect extensive communication between Moore and the wardens between

---

[4] The emails were not sent to the wardens and would be hearsay if offered as direct proof of the truth of what was said in communications with the wardens. The hearsay problems were cured, however, when Wexford's Moore, who wrote or received most of the emails, testified in a follow-up deposition that those emails accurately reported the contemporaneous communications with the wardens. See R. 495-26 (Moore Dep.).

September 2011, when Moore joined Wexford, and January 2014, when plaintiff went into kidney failure.

Moore regularly reported that the warden was frustrated with Dr. Greby's behavior and willing to lock her out of the facility. R. 493-6 at 74 (March 2012), 32 (June 2012), 23-24, 13–14 (Aug. 2012); R. 493-7 at 18 (Nov. 2011). She also reported that the warden and assistant wardens were "very communicative with [Wexford's director of nursing] and I in regards to any concerns that they have had" regarding Dr. Greby. R. 493-6 at 69 (March 2012).

In February 2012, nearly two years before Ollison's renal failure crisis, a review of Dr. Greby's performance noted that the "New Warden/Administration [was] not as tolerant waiting on Wexford action before locking her out." R. 493-6 at 94 (calling for one-month suspension without pay). Shortly after that review, the acting warden and assistant warden "reviewed at length" the Final Warning issued to Dr. Greby by Wexford. R. 493-6 at 72 (Moore March 9, 2012 email); R. 495-26 at 57 (Moore Dep.). At that time, they "were made aware of whatever issues there were" regarding Dr. Greby. Moore Dep. at 57. The assistant wardens also periodically requested that Wexford review particular cases of inadequate treatment or unprofessional conduct by Dr. Greby. R. 493-6 at 13–14 (Moore August 3, 2012 email); R. 493-8 at 75–76 (May 2–6, 2012 emails).

In May 2013, Wexford was actively trying to replace Dr. Greby as medical director. Wexford had found a suitable replacement for Dr. Greby and told the Illinois River wardens that a personnel change was imminent. R. 493-4 at 63–68 (May 22–26, 2013 emails), 70–73 (May 17-21, 2013 emails). When Wexford decided instead to place Dr. Greby's replacement at

a different prison, Moore updated the warden and assistant wardens. At that time, they said "their preference would be to have Dr. Greby there instead of having no MD at all but understand that if something egregious were to occur, she would be terminated." R. 493-4 at 53 (Moore June 3, 2013 email), 54–55 (Moore May 31, 2013 email).

This evidence is astonishing. I have not seen before reliable evidence of such serious problems in a prison health care facility over such a long time. As early as April 2012, Wexford was aware of Dr. Greby's habit of signing off on abnormal labs without follow up—the exact conduct that led to plaintiff's kidneys failing. Replacing Dr. Greby may have been the goal, but Wexford repeatedly postponed action, watered down proposed sanctions, and failed to replace Dr. Greby before January 2014.

In terms of the bottom line for this appeal, a jury could find that the wardens were well-informed about both the serious threats to prisoner health and safety posed by Dr. Greby and the failure to take effective action to improve her performance or to replace her. Like Wexford, both wardens hoped for the best while leaving prisoner-patients vulnerable to "egregious" outcomes. Only after Dr. Greby's failures put plaintiff Ollison on life support and led to the death of another prisoner-patient was she fired, as Wexford and the warden had known she needed to be for more than a year.

We are required to consider all of this evidence in the light reasonably most favorable to plaintiff. The cumulative effect of plaintiff's evidence here would let a reasonable jury find that not only Dr. Greby but also Wexford as a company and Warden Nicholson or Warden Gossett or both acted with

deliberate indifference to known, systemic deficiencies in the health care unit.

Focusing on the wardens, the Wexford emails and Moore testimony provide powerful direct and circumstantial evidence that they were well aware that Dr. Greby was acting both incompetently and with cruelly deliberate indifference in dealing with prisoners' health needs. Their knowledge stretched back nearly two years before plaintiff's kidneys failed.

The Supreme Court explained the use of circumstantial evidence in Eighth Amendment deliberate indifference cases in *Farmer v. Brennan*: "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence…." 511 U.S. at 842. If a risk is obvious, a jury may infer that a particular defendant knew of it. *Id.* The Court continued:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Id.* at 842–43. Change the phrase "risk of inmate attacks" in that passage to "risk of completely inadequate and cruel health care" and that passage applies directly to this evidence.

The Wexford emails reveal that the risks arising from Dr. Greby's chronic absenteeism, abusive conduct, and flagrant disregard for medical protocol were "longstanding, pervasive, well-documented," and "expressly noted by prison officials in the past." *Id.* at 842. Moore's weekly meetings, the health care unit administrator's characterization of Dr. Greby's philosophy of punishment through medicine, and specific reports of discussions with the wardens about Dr. Greby's conduct indicate that the wardens "had been exposed to information concerning the risk." *Id.* From the combination of emails and Moore's testimony about communications with the wardens, it is reasonable to infer that Illinois River's wardens knew that the senior health care official at the prison was cruel and incompetent, threatening the health and safety of all prisoners.

The problem was a difficult one for Wexford and the wardens, but the stakes were life and death. At this stage, the key fact is that for as much as two years, the wardens did *nothing* to remedy the risk of harm that Dr. Greby posed to prisoner-patients. The long record of delay, ineffective threats, and inaction presents at least genuine issues of fact as to whether the wardens responded reasonably over time to this serious risk to all prisoners. See *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 663 (7th Cir. 2016) ("State-of-mind evidence sufficient to create a jury question might include … the defendant's persistence in 'a course of treatment known to be ineffective ….'"), quoting *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016); *Rasho*, 22 F.4th at 719 (Ripple, J.,

dissenting) (explaining that "prison officials' knowledge that certain 'remedial' actions will not ameliorate the constitutional violation" "bears directly on whether the deliberate indifference standard has been met").

Plaintiff does not necessarily need to show there was a single, unilateral action that the wardens should have taken to address Dr. Greby's misconduct. The legal standard is that they needed to respond reasonably, including by working with Wexford and central headquarters for the Department of Corrections to mitigate harm while Dr. Greby was still working at Illinois River.

Even if the wardens could not have taken unilateral action to fire Dr. Greby, they could have worked with Wexford to protect the health of the prisoners entrusted to their custody during the extended search for her replacement. Plaintiff's medical emergency is illustrative. Nursing staff caught and responded to plaintiff's kidney failure only because Dr. Greby failed to show up to work. A reasonable jury could conclude, for example, that working with Wexford to grant more responsibility to attentive nursing staff working with remote contractors would have been a better solution than Wexford and the wardens holding their breath and just hoping that nothing else serious would happen.

The majority identifies another potential option: the wardens could have sought a temporary Health Care Unit Administrator during the extended period when the permanent administrator was on military leave. When the administrator was available on site, he reviewed complaints about Dr. Greby and requested that a different doctor follow up with specific prisoner-patients. Consulting another doctor about plaintiff's kidney disease may well have prevented his

medical emergency. While the administrator was on leave, Wexford stepped into his role, placing the health care unit at the mercy of Wexford's self-interest and competing priorities, as exemplified by Wexford's last-minute decision to assign Dr. Greby's replacement to another prison. The wardens' failure to maintain adequate supervision over the healthcare unit for an extended period would also support a jury's finding of deliberate indifference.

The record indicates that other possibilities, like locking Dr. Greby out of the facility were discussed. We do not yet have much information about the wardens' efforts to follow through on those discussions. If — as the record suggests — that lack of information is attributable to the wardens' lack of action, that is a further reason to send plaintiff's claims to trial, not to affirm the grant of summary judgment.

Plaintiff was especially vulnerable to the wardens' inaction. His chronic disease needed to be monitored through blood tests because it would not show visible symptoms until it became life-threatening. That is indeed what happened. It happened because Dr. Greby: (a) failed to follow the expert guidance of a nephrologist; (b) failed to respond to plaintiff's abnormal lab results; (c) failed to ensure that he had timely blood tests to monitor his condition; and (d) otherwise failed to address his serious medical needs. And it happened, a jury could find, because Wexford and the Illinois River wardens failed to take reasonable action to protect prisoners like plaintiff from her incompetence and cruelty.

*The Gossett Timing Issue*: The strength of plaintiff's evidence should have made this a relatively straightforward denial of summary judgment. Instead, minor procedural issues and a factual ambiguity introduced four years into the

case by Warden Gossett seem to have distracted the focus of both the district court and the majority from the strength of plaintiff's case.

As noted above, the Wexford emails recount communications with the "warden" without identifying either Warden Nicholson or Warden Gossett by name. In February 2020, when Wexford produced the emails, those omissions did not pose a problem for plaintiff. In the answer to plaintiff's complaint, Gossett admitted that he had been warden during all times relevant to plaintiff's complaint. R. 223 at 7. And in a November 2019 deposition, Gossett had testified that he became an assistant warden at Illinois River in 2011 and warden in July 2012—consistent with the answer to plaintiff's complaint. R. 369-2 at 16. Plaintiff had no reason to doubt Gossett's testimony and conducted multiple depositions after he received the Wexford emails assuming that Gossett had been the warden referred to in the emails. Appellant's Br. at 19.

But then Gossett changed his story. Four months after plaintiff received the Wexford emails and seven months after Gossett's initial deposition, he served unsigned supplemental interrogatory answers saying he did not become assistant warden at Illinois River until March 2013 and warden until September 2013. R. 369-3 at 2 (June 23, 2020 Interrogatories). He confirmed that timeline in a second deposition. R. 369-4 at 34, 64, 72 (July 16, 2020 Dep.). When asked why he had given different dates in his first deposition, Gossett explained that he had been retired for more than five years and had not seen his personnel file before his original deposition. *Id.* at 72.

Then, however, undermining the idea that he had merely corrected a mistake, Gossett said in October 2020 in support

of his motion for summary judgment that it was an undisputed fact that "at all times relevant to the Complaint," he was warden at Illinois River. R. 382 at 2. That assertion conflicted with his new supplemental interrogatory answers and his testimony in the second deposition.

The regime of individual liability under Section 1983 makes the issue important. Gossett's new story about his dates of employment implied that Nicholson had been warden during 2012 and into 2013. That change, combined with the Wexford emails and Moore's testimony, tended to shift responsibility from Gossett to Nicholson, at least for much of the relevant time. The new Gossett story thus indicated that Nicholson had, as warden, personal knowledge of the systemic breakdowns in health care resulting from Dr. Greby's abusive and dangerous medical care of prisoner-patients. But at that point, Nicholson had already been dismissed from the case.

Responding to this new information, plaintiff filed a motion that is critical to fair consideration of this appeal. In September 2020, he moved to modify the earlier order dismissing Nicholson from the case or alternatively, to bar Gossett from disputing his original sworn testimony about his dates of employment. R. 369. The district court characterized plaintiff's motion as "frivolous" and refused to vacate the earlier dismissal order. A4 at 8. The majority and I agree, however, that the judge's stated rationale was wrong. Ante at 10–11 n.26.

The district court then went a step further. It purported to resolve the factual conflict by characterizing Gossett's original answers as merely mistaken and prohibiting plaintiff from using them as evidence. A6 at 23. The district court took the view that Gossett's original and repeated assertion about

when he served as warden was "mistaken, and now cor-
rected." *Id.* The judge said the corrected version would be
deemed conclusive unless plaintiff could produce *additional*
evidence contradicting it. *Id.*

This was an extraordinary ruling, protecting Gossett from
his own contradictions. When a witness gives contradictory
answers to a relevant question, a party is entitled to use either
version he chooses, or both, at least to attack the credibility of
the witness's testimony. See *Allen v. Chicago Transit Auth.*, 317
F.3d 696, 699–700 (7th Cir. 2003) ("When a witness repeatedly
contradicts himself under oath on material matters … the
witness's credibility becomes an issue for the jury; it cannot
be resolved in a summary judgment proceeding."); see also
*Evans v. Griffin*, 932 F.3d 1043, 1048 (7th Cir. 2019) (preparing
for depositions is essential: "Both courts and juries can, and
regularly do, disregard a party's later statements that
contradict earlier deposition testimony.").

Much of the district court's analysis of the merits of
plaintiff's systemic deficiency theory relied on this ruling.
After resolving the factual dispute in the defendants' favor,
the court deemed wide swaths of probative evidence
irrelevant based on when particular emails had been sent. The
court also treated Warden Gossett's testimony as
unassailable, despite the fact that plaintiff would be entitled
to use Gossett's confusion about his dates of employment to
impeach his credibility at trial on virtually any subject.

The majority avoids this problem by relying on supposed
procedural bobbles by plaintiff, but the Gossett timing issue
is critical to considering plaintiff's motion to reconsider and
the later decision on summary judgment. Under Gossett's
corrected answers, the Wexford emails and Moore's

testimony indicate that Nicholson was warden for much of the time Dr. Greby was rendering terrible medical care, that he was well aware of the problems, and that he failed for many months to take effective action in response—i.e., that he acted with deliberate indifference to the systemic problems that led to plaintiff's serious injuries.

Instead of allowing the two warden defendants to play a shell game with their employment dates and relative degrees of knowledge about Dr. Greby, the district court should have left this critical factual issue to be resolved at trial. And even if we accept the district court's erroneous decision to resolve this factual dispute on summary judgment, fairness demanded that the district court reconsider the dismissal of Nicholson and bring him back into the case.

IV. *Mistaken Procedural Rationales for Affirming*

As I have tried to show above, plaintiff has submitted ample evidence that would allow a reasonable jury to find that Warden Gossett or Warden Nicholson or both acted with deliberate indifference. They failed for more than two years to address known systemic deficiencies in Dr. Greby's treatment of the prisoners in her and the wardens' care.

The majority disagrees but does so by focusing on whether the wardens had unilateral power to fire and replace Dr. Greby. That analysis fails to give plaintiff the benefit of his evidence on summary judgment and fails to consider other steps the wardens could have taken. The appalling medical care for plaintiff and other prisoners was known to the wardens over a period of years, not days or even weeks. Their response was to *hope* things improved. As the saying goes, though, "hope is not a strategy." Instead, the majority affirms

the decisions in favor of the wardens primarily on unfair and erroneous procedural grounds. I address first plaintiff's claim against Nicholson and then turn to Gossett.

A. *Warden Nicholson*

The majority and I agree that both district courts erred by finding that plaintiff's claim against Nicholson was barred by the statute of limitations. See ante at 10–11 n.26. Counsel for the defendants agreed at oral argument. The majority affirms, however, on the theory that plaintiff's original complaint did not allege sufficient facts to state a viable claim against Nicholson. That theory is mistaken and unfairly fails to account for the evidence produced in discovery and plaintiff's timely presentation of it to the district court.

*The effect of the statute of limitations error*: As a result of the statute of limitations error, the merits of plaintiff's claim against Nicholson received short shrift in both district courts. The effects of that error played out in three stages.

First, after erring on the statute of limitations, Judge Chang went on, "[f]or the sake of completeness," to address defense arguments that the complaint did not allege sufficient facts to establish Nicholson's personal responsibility for plaintiff's injuries. A2 at 14–16. Plaintiff asked Judge Chang to reconsider the statute of limitations and personal liability issues before transfer to the Central District, but his motion was denied. R. 139; R. 143. The erroneous statute of limitations decision meant that an amendment to cure the supposed deficiency would have been futile. After all, the court had just said, albeit mistakenly, that the claim against Nicholson was barred no matter what level of factual detail might have been alleged.

Three years later in 2020, after the case had been transferred to the Central District, the role of Warden Nicholson resurfaced. A contentious discovery process in the Central District led to the two developments discussed above in Section III-C: (1) Wexford produced strong evidence that the wardens had actual knowledge of the systemic problems with Dr. Greby and the health care unit; and (2) Gossett contradicted his original testimony about the dates he was employed at Illinois River.[5]

It's understandable that plaintiff's focus returned to Nicholson only after Gossett changed his testimony in 2020 about when he became warden. Judge Chang had already twice found his claim against Nicholson to be time-barred.

When Gossett's new testimony shifted much of the potential responsibility back to Nicholson, the strategic calculation for plaintiff shifted with it. Plaintiff responded to the new discovery and Gossett's about-face by putting the timeliness and merits of the claim against Nicholson squarely in front of Judge Shadid in the September 2020 motion to reconsider. See R. 369.

Judge Shadid denied plaintiff's motion to reconsider by repeating the statute of limitations error. Most important for this appeal, however, he declined to rule on plaintiff's argument about the substance of his claims against Nicholson—the allegations in the original complaint as amplified by the new evidence that Nicholson was fully aware of Dr. Greby and the systemic failings of the health care

---

[5] Again, this view of the evidence is through the lens of defendants' summary judgment motion, giving plaintiff the benefit of conflicts in the evidence and of favorable, reasonable inferences from the evidence.

unit. In reliance on his legal error about the statute of limitations, Judge Shadid treated plaintiff's arguments about the merits as "moot." A4 at 8. He did not exercise his discretion to consider the new evidence against Nicholson.

To sum up, both district courts were wrong about the statute of limitations defense, and, based on that mistake, the second district court declined to address the sufficiency of the pleadings and evidence against Nicholson. When the district court's only stated rationale for denying a decisive motion was wrong, reversal is routine. That is so even if we might hypothesize other reasons for reaching the same result.

Judge Shadid's legal error on the statute of limitations is sufficient to warrant reversal, but he also reversibly erred by failing to exercise his discretion to consider plaintiff's newly discovered evidence against Nicholson. Where the law gives a trial court discretion that the court does not recognize and exercise, the failure to exercise discretion constitutes an abuse of discretion. E.g., *Childress v. Walker*, 787 F.3d 433, 443 (7th Cir. 2015); *LSLJ Partnership v. Frito-Lay, Inc.*, 920 F.2d 476, 479 (7th Cir. 1990) (finding that "the district court's erroneous denial of jurisdiction resulted in an abuse of its discretion when it failed to exercise any discretion by not reaching the merits of the plaintiff's Rule 60(b) motion").

If Judge Shadid had considered plaintiff's evidence, it would have been an abuse of discretion to deny plaintiff the ability to pursue his claim against Nicholson. The obstacles to that claim had been erected by the district courts' errors on the statute of limitations, Gossett's repeated false testimony about when he became warden, and Wexford's prolonged resistance to producing in discovery some of the most critical evidence in the case.

*Undue focus on the original pleadings*: The majority affirms, however, by focusing on the original dismissal on the pleadings almost nine years ago. It loses sight of the evidence plaintiff assembled in the meantime. More specifically, the majority opinion (a) confuses the difference between a claim and a legal theory (which need not be included in a complaint), (b) overlooks the fact that the deficiencies found by the original district court are the sort that we routinely require district courts to allow a plaintiff to cure, and (c) formalistically requires the plaintiff to have tried to cure those problems by moving to amend the complaint rather than as he did, by fairly presenting the claim against Nicholson in the 2020 motion to reconsider.

The end result is that the majority indulges both district courts' errors and dismisses an unusually strong claim without considering its merits or all that happened in the lawsuit after the original complaint was filed. The majority opinion's reasoning will encourage defendants to play procedural games of "gotcha" and will force plaintiffs to guess about when and in how much detail they should update their pleadings with more factual details. This reasoning will also require district courts to waste time on unnecessary motions to amend pleadings.

To explain these points in order, first, the majority recognizes correctly that a plaintiff can pursue a deliberate indifference claim under the Eighth Amendment under two different theories. One theory focuses on deliberate indifference to the individual plaintiff's health and safety. The other focuses on deliberate indifference to systemic threats to many prisoners' health or safety. Ante at 7–8. The majority errs, however, by confusing the difference between a claim

and a legal theory, see ante at 12, 15, 18, and then insisting that the complaint was required to identify the theory plaintiff was pursuing before he could obtain more complete information through discovery.

"A claim is the set of operative facts that produce an assertable right in court and create an entitlement to a remedy. A theory of relief is the vehicle for pursuing the claim; it may be based on any type of legal source, whether a constitution, statute, precedent, or administrative law." *Roberts v. Smith & Wesson Brands, Inc.*, 98 F.4th 810, 815 (7th Cir. 2024), quoting *St. Augustine School v. Underly*, 78 F.4th 349, 352 (7th Cir. 2023).

Plaintiff's claim against Warden Nicholson is that the warden's deliberate indifference to prisoners' health and safety caused plaintiff to suffer renal failure and his consequent injuries. His complaint did not need to specify legal theories. E.g., *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam) (summarily reversing dismissal for failure to invoke § 1983 in complaint); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("we have stated repeatedly (and frequently) that a complaint need not plead legal theories, which can be learned during discovery").

Next, the majority errs by holding plaintiff to the facts alleged in his original complaint. Whether the original complaint sufficiently pled a plausible claim against Warden Nicholson is in the eye of the beholder. See *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 520 (7th Cir. 2015) ("In the wake of *Twombly* and *Iqbal*, there remain considerable uncertainty and variation among the lower courts as to just how demanding pleading standards have become."). Most of the factual allegations in the original complaint focused on medical personnel and

Wexford, against whom plaintiff developed a strong enough case to settle for three million dollars. The allegations about the warden defendants were sparse. While I think they were sufficient to provide fair notice, the *Twombly-Iqbal* standard varies widely in application.

The key point now is that the deficiencies the majority relies upon are the sort that we have repeatedly insisted district courts give a plaintiff a fair opportunity to cure. E.g., *id*. at 519–20; see also, e.g., *Abu-Shawish v. United States*, 898 F.3d 726, 738 (7th Cir. 2018); *Perez v. Fenoglio*, 792 F.3d 768, 783 (7th Cir. 2015) (noting this rule applies to prisoners); *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1022–23 (7th Cir. 2013); *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 & n.3 (7th Cir. 2004). In this case, of course, it would have seemed futile to try to cure those deficiencies by amending the complaint because of the Northern District's erroneous finding on the statute of limitations.

Until plaintiff received a favorable decision on the statute of limitations, amending his complaint with detailed factual allegations about Nicholson would have done him little good. It was perfectly reasonable for him to address this dilemma by putting the statute of limitations and personal liability issues before Judge Shadid at the same time in his motion to reconsider.[6]

Whether plaintiff did or did not also include in that motion a request to amend his complaint is a hypertechnical formalism. It should not control this appeal. We do not require

---

[6] Even under Gossett's revised employment dates, plaintiff's claim against Nicholson would have still been time-barred under the district courts' erroneous view of the statute of limitations issue.

plaintiffs to file futile motions to amend their complaints in order to preserve their claims. See *Brown & Williamson Tobacco Corp. v. Jacobson*, 713 F.2d 262, 270 (7th Cir. 1983) (defendant's view that plaintiff should have moved for leave to file an amended complaint instead of appealing district court's dismissal of complaint was "untenable" where district court dismissed complaint on a variety of grounds, only one of which could have been cured by amendment: "The filing of such a motion would therefore have been futile, and was not required.").

*Our discretion on appeal*: The majority opinion compounds the district court's errors by failing to exercise our discretion to consider plaintiff's additional factual allegations. "A party appealing a Rule 12(b)(6) dismissal may elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (collecting cases); accord, e.g., *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 861 (7th Cir. 1999) (reversing dismissal based on factual assertions first raised on appeal). We are in the business of trying to decide cases fairly and on the merits when possible. See *Runnion*, 786 F.3d at 520 (recognizing "federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities"), quoting *Barry Aviation*, 377 F.3d at 687, quoting in turn 5A Wright & Miller, Federal Practice and Procedure § 1357 (2d ed. 1990).

The majority opinion neither acknowledges nor exercises this discretion. It does not consider any of plaintiff's evidence against Nicholson and uses the district court's resolution of the factual dispute about Gossett's employment dates to limit its review of plaintiff's claim against Gossett. As a result,

plaintiff once again suffers the consequences of both Gossett's false testimony and the erroneous denial of plaintiff's motion to reconsider based on the repeated statute of limitations error that defendants do not even bother to defend.

We have the ability to correct these errors, and we should do so. Even if we assume that plaintiff's original complaint did not allege sufficient facts to state a claim against Nicholson, the Wexford emails and documents and the Moore deposition reveal the deficient practices that were alleged by plaintiff's complaint and are therefore appropriate, even indispensable, for fair consideration of this appeal. That evidence shows both that plaintiff has a substantial claim for relief against Nicholson and that material factual disputes about his knowledge and his actions in the face of that knowledge can be resolved only at trial. We should reverse the judgment in favor of Nicholson and remand for trial on plaintiff's claim against him.

B. *Warden Gossett*

We should also reverse summary judgment in favor of Warden Gossett and remand that claim for trial. The majority again offers a procedural rationale for affirming the grant of summary judgment to Gossett. Its theory is that plaintiff unfairly surprised Gossett in his response to the motion for summary judgment by asserting the theory of deliberate indifference to systemic failures.

The notion of unfair surprise is belied by the history of this case and by the realities of litigation. Plaintiff asserts one *claim* against Gossett, for deliberate indifference to his serious medical condition, causing him to suffer renal failure in January 2014. There is no doubt that Gossett received

sufficient notice of that *claim*. As discussed above, two broad legal theories are available to prove that claim, one focusing on a defendant's knowledge of and indifference to a particular plaintiff's condition and the other focusing on a defendant's knowledge of and indifference to systemic failings that put many prisoners at risk, including the plaintiff. See supra at 2–3; ante at 7. Plaintiff's original complaint included allegations consistent with both theories against Gossett.

The majority tells us, however, that the factual allegations against Gossett in the original complaint were no better than those against Nicholson, which Judge Chang and the majority have deemed insufficient. The majority then takes an extraordinary step. It hypothesizes a motion to dismiss by Gossett that it thinks could have been granted if it had been filed. Ante at 14. Then it penalizes plaintiff for having failed to try to amend his complaint to defeat that hypothetical motion.

The problem is that Gossett made no such challenge to the original complaint. Once the case against him had progressed through discovery to the point of summary judgment, there would have been no reason to examine retroactively the sufficiency of a complaint filed and answered years ago.[7]

---

[7] To be precise, when Gossett's counsel first appeared in 2016, Gossett joined a pending motion to dismiss, sever, and/or transfer filed by other defendants. R. 93. The motion he joined did not raise any issue about the sufficiency of allegations of any defendant's individual responsibility or the allegations about systemic failures. See R. 48 & 49.

More fundamental, the majority overlooks the fact that motions to dismiss are not mandatory. Defendants may have good strategic reasons for not filing a motion to dismiss. The motion might turn up only curable pleading defects or might help teach a plaintiff how to strengthen his case.

The civil rules and modern case management are designed to minimize the extent of factual and legal surprises at trial. Tools such as contention interrogatories and detailed pretrial orders that specify claims, defenses, legal theories, and supporting factual contentions can help achieve that goal. In my review of the extensive district court record in this case, however, I have not found any deadline that would have required plaintiff to come forward with his detailed factual contentions regarding Gossett's deliberate indifference to the systemic failures in the prison's health care before plaintiff filed his September 14, 2020 motion to reconsider the dismissal of Nicholson. Nor have I found a deadline for amending his complaint with more detailed factual allegations, especially in the absence of a motion to dismiss by Gossett.

The majority opinion nevertheless affirms summary judgment for Gossett because plaintiff did not move to amend his complaint to include such detailed factual allegations. The majority opinion also leaves unclear when plaintiff supposedly should have done so. I suppose the theory is that he should have done so after receiving the critical (and late) discovery productions in February 2020 and no later than the September 2020 motion to reconsider the dismissal of Nicholson.

Instead, the majority relies on *Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023), to conclude that plaintiff's mistake was failing to move to amend his complaint (by some unspecified time) before Gossett moved for summary judgment. Ante at 15–18. *Schmees* tried to clear up some

---

We should not decide an appeal by hypothesizing how such an unfiled motion might have been decided.

tension in this court's case law regarding whether and when a district court may or must allow a party to amend his pleadings, expressly or implicitly, in responding to a motion for summary judgment. See 77 F.4th at 488–90. We explained that "a district court retains discretion to treat new claims presented for the first time in briefing as a constructive motion to amend." *Id.* at 490.

We wrote: "We expect justice will rarely require leave to amend in the context of new claims presented for the first time in opposition to a motion for summary judgment." *Id.* at 489. For a genuinely new *claim*, that is correct, but both *Schmees* and the majority opinion here confuse legal theories and claims. Plaintiff adequately pleaded a deliberate indifference claim against Warden Gossett. Nonetheless, the majority says the district court had discretion to bar this plaintiff from relying on new facts uncovered in discovery to support a theory that was raised, albeit imperfectly, in the original complaint.

The majority's finding that the district court did not abuse its discretion to consider the facts supporting plaintiff's systemic deficiencies theory will undermine one of the goals of *Schmees*. *Schmees* thought it was *not* adopting a rule "that could burden courts with a slew of perhaps-unnecessary motions to amend." 77 F.4th at 489, citing Fed. R. Civ. P. 1 (federal rules should be employed to promote "just, speedy, and inexpensive" resolution of cases). With respect, the majority's application of *Schmees* here will have precisely that undesirable effect. It will give plaintiffs strong incentives to file otherwise unnecessary motions to amend. Plaintiffs filing such motions should cite this case as their reason for doing so. The majority's reasoning will also give defendants strong incentives to file motions to take advantage of any plaintiff's failure to

make such amendments as would satisfy a district court trying to follow this majority opinion's reasoning.

To be sure, under the majority's reasoning, I believe district judges should have ample discretion to reject such defense motions trying to spring pleading traps on plaintiffs. The problem, though, is that plaintiffs will not be able to count on such favorable discretion. They will instead have to protect themselves from such traps by anticipating them and moving, perhaps repeatedly, to amend their complaints as more and more facts become known through discovery and otherwise.

The majority believes plaintiff should have given the court and Gossett "more adequate notice of his intent to make a claim [read: rely on a theory] of systemic deficiencies based on facts not alleged in the complaint." Ante at 17. The majority even endorses the district court's criticism of plaintiff for not having included in his original complaint, in 2016, "the Health Care Administrator's tenure, Dr. Greby's absenteeism, Wexford's consideration of terminating Dr. Greby's employment, an alleged cover up, or Defendant Gossett's knowledge of any specific deficiencies in the provision of medical care." Ante at 14, quoting App. A7 at 25.

This reasoning loses sight of the realities of litigation and the reasons for discovery. It would have been a rare case indeed for a prisoner to have known about any of those sorts of facts—hidden in the defendants' files and memories—when he filed the complaint. Plaintiff Ollison had to fight tenaciously against unjustified resistance to his legitimate discovery requests. His efforts uncovered the evidence of systemic failures and evidence that Wexford management and Gossett and/or Nicholson knew about them. The fact that plaintiff wanted to rely on facts newly uncovered through

discovery should distinguish this case from *Schmees*. In that case, all the new factual allegations included in the plaintiff's brief in opposition to summary judgment were known to the plaintiff from the day she first filed her complaint. See *Schmees*, 77 F.4th at 486–88.

Furthermore, in *Schmees* the plaintiff had proposed an amended complaint with the facts underlying her legal theory, but she ultimately chose not to pursue it. *Id.* at 490. We relied on this fact, emphasizing that it was reasonable for the defendant to believe that the plaintiff was no longer pursuing any claim based on the facts contained in the proposed, but never refiled, amended complaint. *Id.* No such willful abandonment of a claim or legal theory can be attributed to plaintiff Ollison in this case.

To the contrary, shortly after receiving and digesting the evidence uncovered by discovery, plaintiff sought and obtained leave to depose Moore and Gossett about their supervision of the health care unit. Then, plaintiff put that evidence squarely in front of the district court, as well as Gossett and his counsel, in the September 2020 motion to reconsider the dismissal of Nicholson. In that motion, he argued that Gossett "was in fact very much aware of the harm [Dr. Greby] was causing and he was involved in the attempts to fire Greby for more than a year prior to her firing." R. 369 at 15.

Accordingly, the idea that plaintiff's opposition to summary judgment unfairly surprised Gossett or the court cannot withstand scrutiny of the full record here. If there is any unfairness, it is being pulled on plaintiff with Gossett's disingenuous cries of "surprise" and the district judge's and majority's reward for that tactic.

It is not at all clear that *Schmees* should apply in a case like this one, in which the plaintiff wants to rely on facts revealed through discovery to pursue a particular legal theory to oppose summary judgment. After discovery has been completed, case management orders and pretrial conferences, not the complaint, organize litigation. And again, in this case the majority should but does not identify a disclosure deadline that plaintiff supposedly missed.

Summary judgment practice is already complex and expensive enough. The combination of *Schmees* with its application in this case will push plaintiffs' lawyers to anticipate motions for summary judgment and to move to amend complaints in advance to include factual details that they expect to want to include in their response to the expected defense statement of material facts. That prospect is only going to add to expense, to wasted time by lawyers, to "perhaps-unnecessary motions to amend," and to the prospect of deciding cases not on their merits but by unfair games of "gotcha" based on the sufficiency of pleadings that were answered years earlier. It also loses sight of the pleading standard in Rule 8, calling for "a short and plain statement of the claim showing that the pleader is entitled to relief."

We should reverse the dismissal of plaintiff's claim against Warden Nicholson and summary judgment for Warden Gossett and remand this case for trial. I respectfully dissent.